**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| 3M COMPANY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 1:20-cv-00697 |
| NEXUS MEDICAL LLC, | § | |
| VINASIA CHE TAO LLC, and | § | |
| DOES 1-10 | § | |
| | § | |
| Defendants. | | |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff 3M Company, by and through its undersigned attorneys, as and for its Complaint against Defendants Nexus Medical LLC ("Nexus Medical") and VinAsia Che Tao LLC ("VinAsia," and collectively with Nexus Medical, "Defendants") as well as any presently unknown pseudonyms, affiliated entities, or persons acting in concert with Defendants ("Does 1 – 10"), hereby alleges as follows based on knowledge of 3M's own actions, and on information and belief as to all other matters:

## I.     NATURE OF THE ACTION

1.     This lawsuit concerns Defendants' ongoing attempts to claim that they represent 3M, and their unauthorized use of 3M's name and famous trademarks, to perpetrate a false and deceptive scheme on unwitting customers and consumers during the global COVID-19 pandemic.

2.     In their effort to lure in customers and to legitimize their fraudulent operations, Defendants have borrowed the credibility of an array of different persons and entities that, upon information and belief, are not currently associated with Defendants, including 3M, Thompson &

Knight, Ernst &Young, Chicago Title, Plains Capital Bank, and many reputable and/or famous individuals.

3.      Nexus Medical seeks to benefit from the good reputation of others to dupe unsuspecting individuals to pay money, into escrow or otherwise, for 3M N95 respirators that Defendants cannot deliver. Defendants' motivation is to profiteer from our national crisis. Defendants have repeatedly claimed false affiliations with 3M that violate not only 3M's rights under the Lanham Act, and Texas statutory and common law, but also run afoul of criminal law.

4.      Defendants are still at it. 3M brings this action to ask this Court to put a stop to Defendants' unlawful and unethical activities, to protect the public from the fraud, and to protect 3M's name and reputation from being associated with Defendants' scam.

5.      In May 2020, attorneys for Nexus Medical prepared sham correspondence to 3M on at least three separate occasions, wherein Nexus Medical falsely claimed to have escrowed a total of over ***six billion dollars*** for the purchase of 3M respirators. Nexus Medical falsely claimed to have issued "Purchase Orders" to 3M tied to the enormous sums escrowed. Nexus Medical further represented it had "been asked by State Governments, Hospital Groups and First Responder organizations to source masks for their personal protective equipment ("PPE") needs. One such example is the State of California." The letters further represent there are escrow accounts at Plains Capital Bank administered by Chicago Title. Notably, Nexus Medical and its attorneys did not mail these letters to 3M; 3M learned of them after being contacted by the firm management at Thompson & Knight—the law firm on whose letterhead these letters were written—and 3M was told that the attorney who wrote the letters was not authorized to do so. On information and belief, Thompson & Knight no longer represents Nexus Medical.

6.      At the same time, Nexus Medical sought to lure unwitting buyers into placing large amounts of money in escrow to purchase billions of 3M N95 respirators. To legitimize its operations, Nexus Medical represented it placed "Purchase Order 2004241" for "100,000,000 3M 1860 respirators" for the State of California Division of General Services. Nexus, having no relationship with 3M at all, does not have the ability to place an order with 3M as represented.

7.      In correspondence to unwitting buyers, Nexus Medical, through its then-counsel, provided what it termed a "Proof of contractual relationship with 3M." This document asserted that Nexus Medical "has contractual relationships directly with 3M" and "***has placed*** and can place order for production of 3M 1860 masks in the One Hundred Million mask allotments or more." Nexus Medical is not an authorized 3M distributor and is not an authorized channel for the placement of an order for 3M respirators, much less a hundred million of them. On information and belief, the law firm on whose letterhead this letter was sent—Thompson & Knight—later disavowed its contents. Yet, by all appearances, Defendants are continuing to run this scam to this day.

8.      On May 6, 2020, Defendant VinAsia, who presented itself as a "3M Authorized Sub-Distributor" (it is not), sent correspondence to Instadose Pharma Ltd. ("Instadose"). VinAsia stated it had secured "the production of your 50 Million N95 1860 protection mask purchase order for your customer Shlomot Medical Services Ltd." and urged Instadose to "open an Escrow Account with our Nationally recognized Law Firm Thompson & Knight LLP and Hesse and Hesse." To increase the pressure to fall for the scam, VinAsia stated that the opportunity to acquire 50 million masks was only available for the next 24 hours. VinAsia further represented that its escrow procedure provides "protection for all parties involved" and that such an arrangement is a "standard PPE practice." Such actions are not standard for 3M, or its authorized distributors of

PPE, and Defendants' actions are all in an effort to deceive customers into entering into a sham transaction trading on 3M's good name and products.

9.      In a shameless attempt to rope 3M's good name into their fraudulent operations, VinAsia repeatedly outlined 3M's supposed involvement in the process, including: "1) 3M manufactures masks; 2) 3M then has an SGS report done to inspect quality and reliability; 3) 3M will ship the product to the customer CIF; 4) 3M notifies the attorneys, customer, and Sellers with an SGS report and shipping report; 5) The attorneys then release payment ONLY for the product being shipped and passed inspection." VinAsia sought to falsely portray knowledge of and involvement with 3M's production, inspection and shipment procedures in order to garner customer confidence and induce them into a fraudulent transaction. In fact, these supposed steps are simply lies; 3M sells through its authorized distributors with processes that do not resemble those described in VinAsia's letter. Finally, VinAsia falsely represents it has access to 3M's respirators through a production line in California for nearly a double mark-up of 3M's pricing. More lies: 3M does not manufacture respirators in California.

10.     Acting in concert, VinAsia posed as a "3M Authorized Sub-Distributor" and Nexus Medical claimed to have "contractual relationships directly with 3M" to mislead unknowing consumers into sham transactions worth millions of dollars. VinAsia and Nexus Medical sought to profiteer from their fraudulent scheme by taking advantage of medical practices in New York City at the time the city was the epicenter of the pandemic. In an effort to rush transactions and "guarantee" legitimacy, they made claims of 24-hour availability and guaranteed the involvement of reputable third parties as escrow agents. All of this was false.

11.     In May 2020, in connection with the sale or purchase of purported 3M-brand N95 respirators, Defendants falsely claimed to be/have:

- "contractual relationships directly with 3M"

- "can place order for production of 3M 1860 masks"

- "secured the production of … 50 Million N95 1860 protection mask purchase order"

- Authorized 3M distributors of N95 respirators;

- Escrowed over *six billion dollars* to purchase 3M respirators; and

- Procured PPE for "State Governments, Hospital Groups and First Responder organizations" including the "State of California."

None of this is true.

12.     The truth is that 3M has never had any affiliation whatsoever with Defendants, whose fraudulent scheme during a global pandemic represents not only a new low in rapacious profiteering, but also endangers lives and wastes precious time and resources by diverting buyers from legitimate sources of much-needed respirators.

13.     3M brings this lawsuit to ensure that, at a bare minimum, its name, reputation, goodwill, and famous marks are not damaged by being used in connection with an ongoing scheme to defraud people seeking personal protective equipment during a pandemic. 3M respectfully requests that this Court preliminarily and permanently order Defendants to cease using 3M's name and 3M Trademarks (as defined below); to cease falsely claiming to be affiliated with 3M, whether as an authorized distributor or otherwise; and to cease making false representations concerning 3M.

14.     In addition to the damages and injunctive relief sought in this complaint, 3M has referred this matter to federal law enforcement. 3M will donate all monetary recoveries in this lawsuit to charitable organizations for COVID-19 relief.

## II.      **BACKGROUND**

15.      Throughout its history, 3M has provided state-of-the-art, industry-leading scientific and medical products to consumers throughout the world under its famous 3M name and 3M Trademarks. Based on this longstanding, continuous use, consumers associate the 3M trademarks uniquely with 3M. Now, more than ever, consumers are also relying on the famous 3M name and 3M Trademarks to indicate that the products offered thereunder are of the same superior quality that consumers have come to expect over the past century. This is especially true with respect to 3M's numerous industry-leading healthcare products and PPE including 3M-brand N95 respirators.

16.      Healthcare professionals and other first responders are heroically placing their health and safety on the line to battle COVID-19. To assist in the battle, 3M is working around the clock to supply healthcare workers, first responders, and critical infrastructure operators with millions of 3M-brand respirators. Beginning in January, 3M began increasing its production of 3M-brand respirators, doubling its global output to a current rate of 1.1 billion per year, or 100 million per month. In the United States, 3M is producing respirators at a rate of 50 million per month this month (well over a million per day), and will reach a rate of more than 95 million per month by October 2020.  3M also is investing in the capital and resources to enable it to double its respirator production capacity once again, to 2 billion globally before the end of 2020. To supplement its U.S. production, 3M is also importing at least 222 million 3M-brand respirators from 3M's production facilities overseas. In the United States, the majority of 3M's respirators are going to healthcare and public health users, with the remaining deployed to other critical industries such as energy, food and pharmaceuticals. The U.S. distribution of 3M-brand respirators is being coordinated with the Federal Emergency Management Agency, which is basing allocation decisions on the most urgent needs.

17.     The demand for 3M-brand respirators has grown exponentially in response to the pandemic, and 3M has been committed to seeking to meet this demand while keeping its respirators priced fairly. 3M is working with customers, distributors, governments, and medical officials to direct 3M supplies to where they are needed most. Importantly, 3M has **not** increased the prices that it charges for 3M respirators as a result of the COVID-19 outbreak.

18.     In the midst of these efforts by 3M and the global health community to respond to the pandemic, certain bad actors have sought to exploit the crisis and prey on innocent parties through a variety of scams involving 3M N95 respirators and other health-related products in high demand. These scams include unlawful price-gouging, fake offers, counterfeiting, and other unfair and deceptive practices—all of which undercut the integrity of the marketplace and constitute an ongoing threat to public health and safety.

19.     In response to fraudulent activity, price-gouging and counterfeiting related to 3M N95 respirators that has spiked in the marketplace during the pandemic, 3M is taking an active role to combat these activities. 3M's actions include working with law enforcement authorities around the world, including the Department of Justice, state Attorneys General, the Federal Bureau of Investigation, the U.S. Attorney General, and local authorities to combat price-gouging and other unlawful activities. 3M has established a dedicated point of contact for federal and state procurement officials to promptly validate third-party offers and quotes. In doing so, 3M has already helped prevent dozens of potentially fraudulent transactions with federal agencies, state governments, municipal governments, private enterprises and other organizations. Every U.S. Governor has been briefed on 3M's efforts, and 3M is in regular contact with numerous governors and state attorneys general regarding these efforts to prevent and combat fraud. The Department of Justice has publicly thanked 3M for the assistance it has provided in investigations that have led

to arrests. *See* Press Release: New Jersey Man Arrested For $45 Million Scheme To Defraud And Price Gouge New York City During COVID-19 Pandemic, available at https://www.justice.gov/usao-sdny/pr/new-jersey-man-arrested-45-million-scheme-defraud-and-price-gouge-new-york-city-during (May 26, 2020). 3M has provided information relating to the instant case to federal and state law enforcement as well.

20.     3M has also created a website where people can report potential price-gouging and a "3M COVID-19 Fraud hotline" where end-users and purchasers of 3M products in the United States and Canada can call for information and to help detect fraud and avoid counterfeit products. 3M is also publishing information about its anti-price-gouging and counterfeiting efforts on 3M's website, including disclosure of 3M's list prices for its N95 respirators so that customers can identify and avoid inflated prices, and the web address and phone numbers that can be used to identify 3M's authorized distributors and dealers in the United States and Canada. Further information about 3M's efforts are set forth in the 3M press release and publication attached hereto as Exhibits 1 and 2.

21.     A key component of 3M's efforts to combat fraud, price gouging, and counterfeiting has been the removal of bad actors through policing their activity on the internet. 3M has successfully secured the removal of more than 3,000 websites and sales offers with fraudulent or counterfeit product offerings from online marketplaces around the world, more than 4,000 false or deceptive social media posts, and more than 100 deceptive internet addresses.

22.     Including this action, 3M has filed seventeen lawsuits in various courts in its fight against fraud, price gouging, and counterfeiting. 3M has won five temporary restraining orders and four preliminary injunction orders from courts across the country that put a stop to other defendants' unlawful and unethical profiteering from the pandemic, and has reached settlements

in other matters where the defendants have signed written agreements unequivocally agreeing to immediately cease their misconduct. Any recovery obtained in pursuing these suits (including the case at bar) will be donated to charitable COVID-19 relief efforts.

23.     Despite these extensive efforts during this crisis, deplorable pandemic profiteers continue to prey on and deceive consumers, including front-line healthcare workers, first responders, and others in a time of need and trade off the fame of the 3M name and 3M trademarks, and falsely associating themselves with 3M and its reputation for providing the highest quality PPE at fair prices. Defendants' scheme to illegally enrich themselves during the current global health crisis exemplifies pandemic profiteering. 3M does not—and will not—condone bad actors deceptively trading on the fame and goodwill of the 3M brand and trademarks for their personal gain. 3M is committed to working to address and prevent the exploitation of the surge in demand for 3M-brand products during this historic health crisis.

24.     Accordingly, to further protect the public from Defendants' fraud and pandemic profiteering, to reduce the amount of time and precious resources healthcare providers and procurement officers are forced to waste interacting with such schemes, as well as to forestall any further diminution to the 3M name, 3M trademarks, reputation, fame, and goodwill, 3M brings this lawsuit against Defendants for federal and state trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, false advertising, unlawful, unfair, and fraudulent business acts and practices. 3M also seeks preliminary and permanent injunctive relief. Any monetary award recovered by 3M will be donated to charitable COVID-19 relief efforts.

### III.    THE PARTIES

25.     Plaintiff 3M Company is a Delaware corporation, with its principal place of business and corporate headquarters located at 3M Center, St. Paul, Minnesota 55144. 3M is a

diversified technology company with a global presence and is among the leading manufacturers of products for many of the markets it serves, including PPE such as 3M-brand N95 respirators.

26.     Defendant Nexus Medical is a Texas limited liability company. Purportedly, Nexus Medical is headquartered in Fredericksburg, Texas and, according to its website, has its primary address at 108 E Trailmoor, Suite 6, Fredericksburg, Texas 78264. A review of the physical address shows no signs of Nexus Medical at 108 E Trailmoor, Suite 6, Fredericksburg, Texas 78264. Like nearly everything else about Nexus Medical, the location itself appears to be a sham. Nexus Medical may be served through its registered agent, Vicky Outlaw.



**108 E. Trailmoor, Suite 6, Fredericksburg, Texas 78264**

27.     Defendant VinAsia is a Wyoming limited liability company. According to its website, VinAsia is a "USA international trading company in Texas, USA . . .and import/export trade consultant." According to its Food and Drug Administration ("FDA") registration, it operates out of 30 N Gould St., Suite 9364, Sheridan, WY, 82801. However, that address appears to be occupied by a registered agent service. VinAsia may be served through its registered agent, Registered Agents. Inc., 30 N Gould St., Suite 9364, Sheridan, WY, 82801.

28.     3M does not know the identity of any additional affiliated entities, or persons acting in concert with Defendants and denominates them for purposes of this Complaint and action as "Does 1 – 10."

### IV.     JURISDICTION AND VENUE

29.     The claims for trademark infringement, unfair competition, false association, false endorsement, false designation of origin, trademark dilution, and false advertising, respectively, asserted in Counts I – IV, *infra*, arise under the Trademark Act of 1946 (as amended; the "Lanham Act"), namely, 15 U.S.C. §§ 1051 *et seq.* Accordingly, this Court has original subject-matter jurisdiction over Counts I – IV pursuant to 28 U.S.C. §§ 1331, 1338(a) and (b), and 15 U.S.C. § 1121(a).

30.     The claims for trademark dilution and trademark infringement, asserted in Counts V – VII *infra*, arise under Texas law, and are so related to the federal claims asserted in Counts I – IV, *infra*, that they form part of the same case or controversy. Accordingly, this Court has supplemental jurisdiction over Counts V – VII pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

31.     This Court also has subject matter jurisdiction on the separate and independent ground of diversity of citizenship pursuant to 28 U.S.C. § 1332(a). There is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs.

32.     Defendants have purposefully availed themselves of the privilege of transacting business within the State of Texas, including in this District. Defendants have also committed and intentionally directed tortious acts towards residents of the State of Texas, including in this District. 3M's claims arise out of and relate to Defendants' transaction of business and tortious acts committed within the State of Texas, including in this District. Based on the foregoing, this Court has long-arm personal jurisdiction over Defendants.

33.     A substantial part of the events giving rise to the claims asserted, *infra*, occurred in this District. Accordingly, venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2).

34.     Defendants are subject to personal jurisdiction in this District. Accordingly, venue is also proper in this District pursuant to 28 U.S.C. § 1391(b)(3).

## V.     FACTS COMMON TO ALL CLAIMS FOR RELIEF

### A.     Plaintiff 3M

35.     3M has grown from humble beginnings in 1902 as a small-scale mining venture in Northern Minnesota to what it is today, namely: an industry-leading provider of scientific, technical, and marketing innovations throughout the world. Today, 3M offers over 60,000 products, ranging from household and school supplies, to industrial and manufacturing materials, to critical medical supplies and protective equipment.

#### 1.     The 3M Brand

36.     3M offers its vast array of goods and services throughout the world under numerous brands, including, for example: ACE; POST-IT; SCOTCH; NEXCARE; and more. Notwithstanding the widespread goodwill and resounding commercial success enjoyed by these brands, 3M's most famous and widely recognized brand is its eponymous "3M" brand.

37.     The 3M brand is associated with products and materials for a wide variety of medical devices, supplies, and PPE, including, for example: respirators; stethoscopes; medical tapes; surgical gowns, blankets, and tape; bandages and other wound-care products; and many more. As a result, 3M-brand products are highly visible throughout hospitals, nursing homes, and other care facilities where patients, care providers, and procurement officers value and rely upon the high quality and integrity associated with the 3M brand.

### 2.     The Famous "3M" Respirators

38.     Over the past century, 3M has invested hundreds of millions of dollars in advertising and promoting its 3M-brand products to consumers throughout the world (including, without limitation, its 3M-brand N95 respirator) under the standard-character mark "3M" and the 3M logo shown below (together, and as described more particularly in paragraph 41 below, the "3M Trademarks"):



39.     For decades, products offered under the 3M name and 3M Trademarks have enjoyed enormous commercial success (including, without limitation, 3M-brand N95 respirators). Indeed, in 2019 alone, sales by 3M exceeded billions of dollars with the vast bulk of such products sold under and in connection with the 3M Trademarks.

40.     Over the same period of time, products offered under the 3M name and 3M Trademarks have regularly been the subject of widespread, unsolicited media coverage and critical acclaim.

41.     Based on the foregoing, consumers associate the 3M Trademarks uniquely with 3M and recognize them as identifying 3M as the exclusive source of goods and services offered under the 3M Trademarks. Based on the foregoing, the 3M name and 3M Trademarks have also become famous among consumers not only in Texas but throughout the United States.

42.     To strengthen 3M's common-law rights in and to its famous 3M Trademarks, 3M has obtained numerous federal trademark registrations, including, without limitation: (i) U.S. Trademark Reg. No. 3,398,329, which covers the standard-character 3M trademark in Int. Classes 9 and 10 for, *inter alia*, respirators (the "'329 Registration"); (ii) U.S. Trademark Reg. No.

2,692,036, which covers the 3M logo for, *inter alia*, a "full line of surgical masks, face shields, and respiratory masks for medical purposes" (the "'036 Registration"); and (iii) U.S. Trademark Reg. No. 2,793,534, which covers the 3M design mark in Int. Classes 1, 5, and 10 for, *inter alia*, respirators (the "'534 Registration"). *See* Exhibits 3-5.

43.     Each of the foregoing Registrations is valid, in effect, and on the Principal Trademark Register.

44.     Each of the foregoing Registrations is "incontestable" within the meaning of 15 U.S.C. § 1065. Accordingly, each Registration constitutes conclusive evidence of: (i) 3M's ownership of the 3M Trademarks; (ii) the validity of the 3M Trademarks; (iii) the validity of the registration of the 3M Trademarks; and (iv) 3M's exclusive right to use the 3M name and 3M Trademarks throughout the United States for, *inter alia*, respirators.

45.     3M's famous name and the 3M Trademarks do more than identify 3M as the exclusive source of goods and services offered thereunder. Indeed, the famous 3M name and 3M Trademarks also signify to consumers that 3M-brand products offered are of the highest quality and adhere to the strictest quality-control standards. Now, more than ever, consumers rely on the famous 3M name and 3M Trademarks' ability to signify that products offered under the 3M name and 3M Trademarks are of the same high quality that consumers have come to expect of 3M over the past century.

### 3.     *3M's Extensive Efforts to Assist with the Battle Against COVID-19*

46.     Medical professionals and first responders throughout the world are donning extensive PPE as they place their health and safety on the line in the battle against COVID-19. As 3M states on the homepage of its website, it is "committed to getting personal protective equipment to healthcare workers."

47.    Among the PPE that 3M is providing to the heroic individuals on the front lines of the battle against COVID-19 are its 3M-brand N95 respirators.



48.    Authentic 3M-brand N95 respirators reduce exposure to airborne biological particles and liquid contamination when appropriately selected, fitted, and worn.

49.    Based on the exponential increase in demand for 3M-brand N95 respirators, 3M has invested in the necessary capital and resources to double its annual production of 1.1 billion N95 respirators. *See* Exs. 1, 2. **What 3M has *not* done in the face of the global COVID-19 pandemic is increase its prices**. *See id.*

50.    Unfortunately, 3M's sense of civic responsibility during this time of crisis is not universally shared and bad actors are seeking to exploit the increased demand for 3M-brand N95 respirators. These opportunists advertise and sell counterfeit, damaged, deficient, or otherwise altered versions of 3M's genuine N95 respirators consumers seeking to protect their health.  In some cases, bad actors advertise 3M-brand N95 respirators without any intention to supply product at all.

51.    To protect both consumers and healthcare workers on the front lines of the COVID-19 battle from deception and inferior products, to reduce time wasted by healthcare providers and procurement officers on scams, as well as to protect 3M's goodwill, reputation, and carefully curated 3M brand, 3M is working diligently with law enforcement, retail partners, and

others to combat unethical and unlawful business practices related to 3M-branded N95 respirators. For example, in late March 2020, 3M's Chief Executive Offer, Mike Roman, sent a letter to U.S. Attorney General, William Barr, and the President of the National Governor's Association, Larry Hogan of Maryland, to offer 3M's partnership in combatting price-gouging. As shown in the inset image, additional examples of 3M's efforts to combat price-gouging, counterfeiting, and other unlawful conduct during COVID-19 include:

    a.    3M posted on its website the list price for its 3M-brand N95 respirators so that consumers can readily identify inflated pricing (*see* Exhibit 6);

    b.    3M created a form on its website that consumers can use to report suspected incidents of price-gouging and counterfeiting (*see* Exhibit 7); and

    c.    3M created a fraud "hotline" that consumers can call to report suspected incidents of price-gouging and counterfeiting.



**B.**    **Defendants' Unlawful Conduct**

52.    Despite 3M's extensive measures to combat price-gouging and prevent illicit sales of 3M-brand N95 respirators, bad actors continue to attempt to exploit consumers. Defendants are prime examples of this unlawful behavior, which jeopardizes public health and safety and risks damaging 3M's brands and reputations. Defendants' misrepresentations and infringement are also

likely to confuse the public into falsely believing that they are affiliated with 3M or authorized 3M distributors.

> **1.** ***Nexus Medical Falsely Claims to be a Distributor to State Agencies, First Responders and the State of California.***

53.     In three letters addressed to 3M for purchase of over ***six billion dollars' worth of 3M respirators,*** Nexus Medical represented it had previously assisted "State Governments, Hospital Groups and First Responder organizations to source masks for their PPE needs. One such example is the State of California." *See* Exhibits 8-10. Nexus Medical's sham attempt to legitimize its operations is only further corroboration that the entire purported operation is a scam. 3M has a limited authorized distributor network of which Nexus Medical is not a part.

54.     Nexus Medical represented it placed "Purchase Order 2004241" for "100,000,000 3M 1860 respirators" for the State of California Division of General Services. *See* Exhibit 11. No such order was placed and Nexus Medical had no access to transact with 3M for such purchase.

55.     Nonetheless, every purported communication to 3M made seeking to purchase 3M's respirators is a false representation in an effort to legitimize Nexus Medical's fraudulent operations.

> **2.** ***Nexus Medical Claims to be Connected to Distinguished and Famous Individuals in Efforts to Legitimize Their Operations and Lure in Consumers***

56.     Defendants are running a scam. Nexus Medical represents that its principals are highly distinguished and accomplished individuals. After thorough searches, 3M has been unable to confirm the affiliation of these individuals with Nexus Medical. It is highly likely these individuals are not associated with Nexus Medical and this is yet another part of their fraudulent scheme to lure in customers. For example, Nexus Medical represents:

a.     Josh Colter is the Chief Investment Officer of Nexus Medical, LLC. Mr. Colter is a seasoned investment banker who started his career at Bear Stearns in New York. Subsequently, he joined private equity firm, Tavistock Group, to work on the buy-side alongside billionaire Joe Lewis. He then worked special situations trading desk, trading merger arbitrage and statistical arbitrage spreads in Monaco. Nexus Medical further represents, his experience includes portfolio management in Paris and trading equity derivatives for BNP Paribas in Geneva, Switzerland and he is the Chief Investment Officer at CGE Group.

b.     Among its principals, Nexus also includes Mr. Anthony Chapa and identifies him as a Retired Assistant Director United States Secret Service. Nexus Medical further represents "Mr. Chapa was instrumental in locating the manufacturing base to provide the PPE products being exclusively sold by Nexus Medical. Anthony M. Chapa serves on the Board of Directors for BLACKOPS Partners Corporation."

c.     Major General Alfred "Freddie" Valenzuela has served thirty-three years in the US Army and was highly decorated for heroism and valor.

d.     Herschel Walker, a former professional football player, businessman and philanthropist. In the NFL, he also played for the Minnesota Vikings, Philadelphia Eagles, and New York Giants. He was inducted into the College Football Hall of Fame in 1999.

e.     Tami Marciano with Family Chateaux is identified as a Nexus "Strategig [*sic*] Partner" who is "an Independent Director and U.S. President of the

Board for our public company Addentax." Addentax is represented to own factories in China and is currently producing PPE products for global distribution, and to be one of three factories authorized to ship PPE products outside of China.

57.     Similarly, Defendants allege to have relationships with and operate their business with the services of: Ernst & Young, Chicago Title, Thompson & Knight and Plains Capital Bank. Upon information and belief Defendants do not currently transact with or employ the aforementioned entities.

### 3.     *Defendants Seek to Defraud Buyers by Claiming a False Affiliation with 3M.*

58.     At the same time as Nexus Medical was representing it was attempting to purchase over six billion dollars' worth of N95 respirators from 3M at $1.27 a respirator, it was also secretly trying to find buyers willing to purchase N95 respirators at the price of at least $2.50 each. *See* Exhibit 12. This represents a markup of $1.23 per respirator—or nearly double—over the price it was seeking to buy, and even more over 3M's published list prices. To put that in perspective, if Nexus Medical had been able to find purchasers at that price for all the $6.7 billion dollars' worth of respirators that it claimed to be purchasing from 3M, its under-the-table net profit on those respirators would be **in the billions of dollars**.

59.     In early May 2020, while Nexus Medical purportedly sought to acquire the six billion dollars in respirators from 3M, Nexus Medical represented, through its then-counsel, to Shlomot Medical Service, Ltd., located in New York City—at the time, the epicenter of the pandemic—it had "contractual relationships directly with 3M by and through licensed 3M distributors and has placed and can place order for production of 3M 1860 masks in the One Hundred Million mask allotments or more." Nexus Medical further made mention of the

involvement of "VinAsia Che Tao, LLC." To be clear, 3M does not have a contractual relationship with Nexus Medical or VinAsia Che Tao LLC. Nor have either one of them ever been an authorized 3M distributor. Thompson & Knight has disavowed its former associate's letter making these representations.

60.     The extent of Nexus Medical's fraudulent operations is unknown at this time. In addition to the abovementioned correspondence, on April 26, 2020, Nexus Medical sent correspondence to Phoenix Endoscopy Products, LLC ("Phoenix") identified as "3m Distributor # 10116827" purporting to confirm that it had two hundred million dollars pledged in escrow for a Purchase Order of "3m 1860 masks." *See* Exhibit 13. This too is fraudulent correspondence. Nexus Medical had no access to place said order, and Phoenix is not and has never been an authorized 3M respiratory product distributor. Then, on May 5, 2020, correspondence from the Temple Law Firm states that Nexus Medical placed "P.O. 2004241" for "100,000,000 3M 1860 respirators" for the State of California Division of General Services. *See* Exhibit 11.

61.     Simultaneously, as Nexus Medical sought to induce customers, it was preparing sham correspondence to 3M through the law firm of Thompson & Knight. To the best of 3M's knowledge, 3M only received the correspondence when Thompson & Knight's General Counsel sent 3M letters explaining that the attorney who signed the letter (who is no longer listed on the firm's website) was not authorized to do so, or to act on behalf of the law firm. The letters appear to be a mechanism to induce unwitting buyers to believe that Nexus Medical had placed colossal orders for 3M respirators directly with 3M. Thompson & Knight openly disclaims the letter and any involvement in the transactions described therein. *See* Exhibits 8-10.

62.     In Thompson & Knight letterhead correspondence, dated April 26, 2020; May 3, 2020; May 7, 2020; and May 11, 2020, Mr. Austin Smith, then an associate at the firm, represented

that Nexus Medical had pledged in escrow a total of over ***six billion dollars*** to purchase 3M

respirators. A six billion dollar respirator purchase would represent multiple years' worth of 3M's

current total production of all models of N95 respirators, and vastly more of 3M's current annual

production of model 1860 respirators alone. Needless to say, everything Defendants were saying

about this purported deal was a lie, and they have no legitimate "contractual relationships directly

with 3M."

63.     Simultaneously, and also through purported Thompson & Knight representation,

Nexus Medical targeted potential buyers offering 3M respirators and representing to be 3M

authorized distributors. One such example is correspondence sent to Shlomot Medical Service,

Ltd. on May 7, 2020, again written by Mr. Smith:

> This correspondence shall confirm that I have verified that Nexus Medical, LLC
> ("Nexus Medical"), has contractual relationships directly with 3M by and through
> licensed 3M distributors and has placed and can place order for production of 3M
> 1860 masks in the One Hundred Million mask allotments or more.

*See* Exhibit 14.

64.     In these communications, Nexus Medical, fraudulently posed as a 3M distributor.

Nexus Medical also falsely represented it had secured PPE equipment for state government and

state agencies. All of this is false.

65.     Similarly, on May 6, 2020, VinAsia made representations to Instadose that it had

"secured the production of your 50 Million N95 1860 protection mask purchase order for your

customer Shlomot Medical Services Ltd., until May 7 2020." *See* Exhibit 12. VinAsia further

represented it had "additional secured 50 million masks [from a] production-line with 3M in

California at the price of $2.50 per mask" and urged Instadose and/or Shlomot to "open an Escrow

Account with our Nationally recognized Law Firm Thompson & Knight LLP and Hesse and

Hesse." Neither VinAsia nor Nexus Medical had placed or secured said orders, nor could they,

since, among other things, 3M does not have a respirator production line in California. Further, Defendants utilized Thompson & Knight's name to lend false sense of legitimacy to their fraudulent operations and to seek to induce persons to deposit money into escrow for sham transactions. Thompson & Knight openly disclaims the above-mentioned correspondence and any involvement in the transactions described therein.

66.     Nexus Medical has also falsely represented to have contractual relationships with 3M and fraudulently stated it had previously **placed** an "order for production of 3M 1860 masks in the one hundred million mask allotments or more." All of this is false. *See* Exhibit 14.

67.     By all appearances, Defendants' conspiracy and fraudulent scheme and unauthorized use of 3M's name, 3M's Trademarks, and reputation continues to this day. As of the time of this filing, Nexus Medical's fraudulent website continues to display 3M-brand respirators as part of their available products without authorization.

68.     While not part of the 3M-related violations, it is worth noting that Nexus Medical's website also has a plainly false representation about a simple four-ply surgical mask, claiming that the mask is "highly comparable" to an N95 respirator. Without extensive testing of the filtering material and a means to provide a tight fit (as provided by N95 respirators), this claim is a dangerous lie.



4 ply N95 Surgical Mask
Product ID: PRM-95
Our PRM-95 is a 4 Ply filter mask
with a carbon layer with more
filtration and highly comparable to
the N95 filters in the marketplace.

## VI.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

*(Trademark Infringement Under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1))*
*(Infringement of the Federally Registered 3M Trademarks)*

69.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

70.     Count I is a claim for trademark infringement under 15 U.S.C. § 1114.

71.     3M is the exclusive owner of each of the federally registered 3M Trademarks. Each of the foregoing is "incontestable" within the meaning of 15 U.S.C. § 1065.

72.     3M has the exclusive right to use each of the 3M Trademarks in United States commerce for, *inter alia*, advertising, promoting, offering for sale, and selling 3M-brand N95 respirators.

73.     Each of the 3M Trademarks are fanciful and/or arbitrary when used for respirators and, therefore, are inherently distinctive.

74.     Each of the 3M Trademarks identifies 3M as the exclusive source of products offered under the 3M Trademarks (including, without limitation, 3M-brand N95 respirators) and, therefore, the 3M Trademarks have acquired distinctiveness.

75.     3M's exclusive rights in and to each of the 3M Trademarks predate any rights that Defendants could establish in and to any trademark that consists of "3M" in whole and/or in part.

76.     Defendants are using the 3M Trademarks in commerce to advertise, promote, offer for sale, and sell 3M-brand N95 respirators, including, for example, in communications to healthcare providers and in connection with the products that Defendants purportedly have available for sale.

77.     Defendants' use of the 3M Trademarks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendants are 3M, and/or whether Defendants are licensees, authorized distributors, and/or affiliates of 3M and/or have access to products that 3M offers under its 3M Trademarks, including, without limitation, 3M-brand N95 respirators.

78.     Defendants' use of the 3M Trademarks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein, is causing, and is likely to continue cause, consumer confusion, mistake, and/or deception about whether Defendants' products are affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Trademarks, including, without limitation, 3M-brand N95 respirators.

79.     Defendants' use of the 3M Trademarks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products, as alleged, herein is causing, and is likely to continue to cause, consumer confusion, mistake, and/or deception about whether Defendants and/or Defendants' products originate with, and/or are sponsored or approved by, and/or offered under a license from, 3M.

80.     3M has not consented to the use of its famous 3M Trademarks by Defendants.

81.     Based on 3M's longstanding and continuous use of its 3M Trademarks in United States commerce, as well as the federal registration of the 3M Trademarks, Defendants had actual and constructive knowledge of 3M's superior rights in and to the 3M Trademarks when Defendants began using the 3M Trademarks as part of its bad-faith scheme to confuse and deceive consumers, as alleged, herein.

82.     Defendants adopted and used the 3M Trademarks in furtherance of Defendants' willful, deliberate, and bad-faith scheme of trading upon the extensive consumer goodwill, reputation, fame, and commercial success of products that 3M offers under its 3M Trademarks, including, without limitation, 3M-brand N95 respirators.

83.     Upon information and belief, Defendants have made, and will continue to make, substantial profits and gain from their unauthorized use of the 3M Trademarks, to which Defendant are not entitled at law or in equity.

84.     Upon information and belief, Defendants' acts and conduct complained of herein constitute trademark infringement in violation of 15 U.S.C. § 1114 (1) (a).

85.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law. The damage suffered by 3M is exacerbated by the fact that Defendants are opportunistically operating their illegal scheme and misrepresentations about 3M-brand respirators during a global pandemic when those products are essential to safeguard the public health. Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and creates a likelihood of confusion about 3M's role in the marketplace for respirators. Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

86.     3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## SECOND CLAIM FOR RELIEF

*(Unfair Competition, False Endorsement, False Association, and False Designation of Origin Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A))*
*(Use of the 3M Trademarks)*

87.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

88.     Count II is a claim for federal unfair competition, false endorsement, false association, and false designation of origin under 15 U.S.C. § 1125(a)(1)(A).

89.     Upon information and belief, Defendants' acts and conduct complained of herein constitute unfair competition, false endorsement, false association, and/or false designation of origin in violation of 15 U.S.C. § 1125(a)(1)(A).

90.     Upon information and belief, Defendants' use of 3M's famous name and 3M Trademarks to advertise, market, offer for sale, and/or sell purported 3M-brand N95 respirators to consumers at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically, also constitutes unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A).

91.     Defendants also falsely represented themselves as affiliated, connected, and/or associated with 3M and/or products that 3M offers under its 3M Trademarks, including, without limitation, 3M-brand N95 respirators. Defendants sought to create the false impression that the products they purported to offer to healthcare workers and others originate from, and/or are sponsored or approved by, and/or offered under a license from, 3M.

92.     Defendants also falsely held themselves out to be agents of 3M to sell and/or distribute 3M-brand products, when this is not the case.

93.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.

94.     3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

### THIRD CLAIM FOR RELIEF

*(Trademark Dilution Under Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c))*
*(Dilution of the Famous 3M Trademarks)*

95.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

96.     Count III is a claim for federal trademark dilution under 15 U.S.C. § 1125(c).

97.     The 3M Trademarks are famous and have been famous at all times relevant to this action. The 3M Trademarks were famous before and at the time Defendants began using the 3M Trademarks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators).

98.     Defendants' use of 3M's famous 3M Trademarks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) is likely to dilute the distinctive quality of the famous 3M Trademarks, such that the famous 3M name and 3M Trademarks' established selling power and value will be whittled away.

99.     Defendants' use of 3M's famous 3M Trademarks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including,

without limitation, 3M's branded N95 respirators) is likely to dilute the distinctive quality of the famous 3M name and 3M Trademarks, such that the famous 3M Trademarks' ability to identify 3M as the exclusive source of products offered under the 3M Trademarks (including, without limitation, 3M's branded N95 respirators) will be whittled away.

100.    Defendants' use of 3M's famous 3M Trademarks in commerce on, for, and/or in connection with the advertising, promotion, offering for sale, and/or sale of products (including, without limitation, 3M's branded N95 respirators) at exorbitant prices, in general, and during a global pandemic such as COVID-19, specifically is likely to dilute the reputation of the famous 3M Trademarks, such that the famous 3M Trademarks' established ability to indicate the superior quality of Products offered under such marks (including, without limitation, 3M's branded N95 respirators), will be whittled away.

101.    Defendants' misconduct also threatens to harm the reputation of the 3M Trademarks, constituting dilution by tarnishment of the famous 3M Trademarks.

102.    Defendants' acts and conduct complained of herein constitute trademark dilution in violation of 15 U.S.C. § 1125(c).

103.    3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law. The damage suffered by 3M is exacerbated by the fact that Defendants are opportunistically operating their illegal scheme and misrepresentations about 3M-brand respirators during a global pandemic when those products are essential to safeguard the public health. Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and creates a likelihood of confusion about 3M's role in the marketplace for respirators. Whereas 3M's corporate values and brand image

center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

104.    3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## FOURTH CLAIM FOR RELIEF

*(False Advertising Under Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B))*

105.    3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

106.    Count IV is a claim for false and deceptive advertising under 15 U.S.C. § 1125(a)(1)(B).

107.    The statements that Defendants made to the public and unwitting consumers contained false, misleading, and/or deceptive statements about the nature, characteristics, qualities, and/or geographic origin of Defendants and/or the products that Defendants allegedly had available for sale and constitute commercial advertising and/or commercial promotion. Defendants' acts and conduct complained of herein constitute false advertising in violation of 15 U.S.C. § 1125(a)(1)(B).

108.    3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law. The damage suffered by 3M is exacerbated by the fact that Defendants are opportunistically operating their illegal scheme and misrepresentations about 3M-brand respirators during a global pandemic when those products are essential to safeguard the public health. Such conduct invites public criticism of 3M and the manner in which 3M's respirators are being distributed and creates a likelihood of confusion about

3M's role in the marketplace for respirators. Whereas 3M's corporate values and brand image center around the application of science to improve lives, Defendants' conduct imminently and irreparably harms 3M's brand.

109.     3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## FIFTH CLAIM FOR RELIEF

*(Dilution and Injury to Business Reputation Under The Texas Trademark Act)*
*(Dilution of, Injury to the 3M Brand and Famous 3M  Trademarks)*

110.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

111.     The 3M Trademarks are valid and protectable trademarks.

112.     Count V is a claim for dilution under Tex. Bus. & Comm. Code § 16.100 et seq.

113.     Upon information and belief, Defendants' acts and conduct complained of herein constitute dilution and injury to business reputation in violation of Tex. Bus. & Comm. Code § 16.103.

114.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.

115.     3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## SIXTH CLAIM FOR RELIEF

*(Unfair Competition and Passing Off Under Texas Common Law)*
*(Use of the 3M  Trademarks)*

116.    3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

117.    The 3M name and the 3M Trademarks are a famous trademarks in the United States, including in the State of Texas.

118.    Count VI is a claim under the Texas common law tort of unfair competition covers situations where a defendant attempts to pass off its goods or services as those of someone else by simulating the trademark owner's product, name, advertising, or marks. It is the umbrella for all statutory and non-statutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters.

119.    Defendants began using the 3M Trademarks in connection with the advertising, marketing, and promotion of products subsequent to the 3M Trademarks becoming famous.

120.    Defendants' advertising, marketing, and promotion of products, through its use of the 3M Trademarks, is unfair competition against 3M.

121.    Defendants have caused the dilution of the distinctive quality of the 3M Trademarks and lessened the capacity of the 3M Trademarks to identify and distinguish 3M's products and services.

122.    Defendants' conduct has caused, and will continue to cause, irreparable harm to 3M.

123.    As result of Defendants' unlawful conduct, 3M is entitled to the injunctive remedies specified in the Prayer for Relief, damages in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, applicable interest, and recovery of all reasonable attorneys' fees and costs incurred herein.

**SEVENTH CLAIM FOR RELIEF**

*(Conspiracy)*
*(Use of the 3M Trademarks)*

124.     3M repeats and incorporates by reference the foregoing statements and allegations as though set forth fully herein.

125.     Defendants, acting in concert with each other, and with intent to commit civil conspiracy, schemed to misappropriate 3M's Trademarks and good reputation in order to injure 3M's business and gain an unfair advantage in the marketplace. Defendants also schemed to wrongfully use 3M's Trademarks to mislead consumers into fraudulent transactions.

126.     Defendants committed an unlawful, overt act to further their conspiracy by posting 3M's Trademarks on their website, posing as 3M authorized distributors and creating a scheme to deceive consumers into sham transactions, through the use of 3M's name, 3M Trademarks and reputation. Defendants' conspired to engage in behavior that is a violation of 15 U.S.C. § 1114 (1) (a); 15 U.S.C. § 1125(c), and Texas common law unfair competition and passing off.

127.     Defendants' conduct has caused, and will continue to cause, irreparable harm to 3M.

128.     3M is entitled to a permanent injunction enjoining Defendants from ongoing conspiracy to misuse the 3M Trademarks.

129.     3M has suffered, and will continue to suffer, irreparable harm from Defendants' acts and conduct complained of herein, unless restrained by law.

130.     3M has been damaged by the acts of Defendants in an amount, currently unknown, to be proved at trial and then donated to charitable COVID-19 relief efforts, and 3M requests the relief set forth in the Prayer for Relief below.

## VII.    <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, based on Defendants' conduct complained of, herein, 3M asks this Court:

A.      To enter an Order, finding in 3M's favor on each Claim for Relief asserted herein;

B.      Pursuant to 15 U.S.C. § 1116:

1.      To preliminarily and permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from using the 3M Trademarks (or any other trademark(s) confusingly similar thereto) for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, 3M-brand N95 respirator masks;

2.      To preliminarily and permanently enjoin Defendants, their agents, servants, employees, officers and all persons and entities in active concert and participation with them from falsely representing themselves as being distributors, authorized retailers, and/or licensees of 3M and/or any of 3M's products (including, without limitation, 3M-brand N95 respirator) and/or otherwise falsely representing to have an association or affiliation with, sponsorship by, and/or connection with, 3M and/or any of 3M's products and/or 3M's officers or employees; and

3.      To order Defendants to file with the Court and serve upon 3M's counsel, within 30 days after service of the order of injunction, a report in writing under oath setting forth in detail the manner and form in which each Defendant has complied with the injunction;

C.      Pursuant to 15 U.S.C. § 1117:

1.      To order Defendants to provide 3M with a full accounting of all manufacture, distribution and sale of products under the 3M Trademarks (including, without limitation, 3M-brand N95 respirators), as well as all profits derived therefrom;

2.      To order Defendants to disgorge and pay to 3M— for donation to charitable COVID-19 relief efforts —all of Defendants' profits derived from the sale of infringing goods offered under the 3M Trademarks (including, without limitation, 3M-brand N95 respirators);

3.      To award 3M— for donation to charitable COVID-19 relief efforts —treble damages in connection with Defendants' infringement of the 3M Trademarks;

4.      To find that Defendants' acts and conduct complained of herein render this case "exceptional"; and

5.      To award 3M— for donation to charitable COVID-19 relief efforts —its costs and reasonable attorneys' fees incurred in this matter;

D.      Pursuant to 15 U.S.C. § 1118, to order the destruction of any unauthorized goods and materials within the possession, custody, and control of Defendants that bear, feature, and/or contain any copy or colorable imitation of the 3M Trademarks;

E.      Pursuant to Texas Statutes and Common Law:

1.      To award 3M—for donation to charitable COVID-19 relief efforts—treble damages in connection with Defendants' illegal acts;

2.      To award 3M—for donation to charitable COVID-19 relief efforts—its costs and reasonable attorneys' fees incurred in this matter;

F.      To award such further restitution as authorized by law, which 3M will donate to charitable COVID-19 relief efforts;

G.      To award 3M pre-judgment and post-judgment interest against Defendants, which 3M will donate to charitable COVID-19 relief effort;

H.      To award 3M such other relief that the Court deems just and equitable;

I.      To order that all monetary payments awarded to 3M be donated to a COVID-19 charitable organization(s)/cause(s) of 3M's choosing.

## DEMAND FOR JURY TRIAL

3M hereby requests a trial by jury for all issues so triable, pursuant to Fed. R. Civ. P. 38(b) and 38(c).

Dated: June 30, 2020                              **NORTON ROSE FULBRIGHT US LLP**


                                                  */s/ Michael W. O'Donnell*
                                                  Michael W. O'Donnell
                                                  State Bar No. 24002705
                                                  mike.odonnell@nortonrosefulbright.com
                                                  Aimeé Vidaurri
                                                  State Bar No. 24098550
                                                  aimee.vidaurri@nortonrosefulbright.com
                                                  Frost Tower
                                                  111 W. Houston Street, Suite 1800
                                                  San Antonio, Texas 78205
                                                  Telephone:  (210) 224-5575
                                                  Facsimile:  (210) 270-7205

                                                  Paul Trahan
                                                  State Bar No. 24003075
                                                  Paul.trahan@nortonrosefulbright.com
                                                  98 San Jacinto Boulevard, Suite 1100
                                                  Austin, Texas 78701
                                                  Telephone:  (512) 536-5288
                                                  Facsimile:  (512) 536-4598

                                                  *Attorneys for Plaintiff 3M Company*